RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0133p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JAMES LOSSIA, JR.; ALEXANDRA PLAPCIANU, individually and on behalf of others similarly situated,

*Plaintiffs-Appellants*,

*v.*

FLAGSTAR BANCORP, INC., aka Flagstar Bank,

*Defendant-Appellee*.

┐
│
│
│
├ No. 17-1468
│
│
│
┘

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-12540—George Caram Steeh, District Judge.

Argued: June 5, 2018

Decided and Filed: July 6, 2018

Before: BOGGS, SILER, and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** Ronald G. Acho, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellants. Sonal Hope Mithani, MILLER, CANFIELD, PADDOCK & STONE, P.L.C., Ann Arbor, Michigan, for Appellee. **ON BRIEF:** Ronald G. Acho, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellants. Sonal Hope Mithani, Colin M. Battersby, Caroline B. Giordano, MILLER, CANFIELD, PADDOCK & STONE, P.L.C., Ann Arbor, Michigan, for Appellee.

_____

**OPINION**

_____

BOGGS, Circuit Judge.  This is a breach-of-contract case arising from the order in which Flagstar Bank (Flagstar) processes Automated Clearing House (ACH) transactions.  James Lossia, Jr. and Alexandra Plapcianu are former checking-account customers of Flagstar.  Lossia asserts that his checking-account agreement required Flagstar to process his ACH transactions in the order that he initiated them, which Flagstar admittedly did not do.  But because the plain language of the agreement does not require Flagstar to process transactions in the order that the customer initiated them, we affirm the district court's grant of summary judgment to Flagstar.

**I**

**a.  The Agreement and NACHA Guidelines**

Plaintiffs opened a joint checking account at Flagstar in December 2014.  The checking account was subject to the terms listed in Flagstar's "Terms and Conditions" disclosure guide (the Agreement).  The Agreement discusses the method by which Flagstar will process transactions, including ACH transactions.  ACH transactions are electronic payments made from one bank account to another and involve one party providing their account number and routing number.  Common ACH transactions include online bill pay and an employee's direct deposit. *ACH Network: How it Works*, NACHA The Electronic Payments Association, https://www.nacha.org/ach-network (last visited June 14, 2018).

> In the "Payment Order of Items" section, the Agreement states:
>
> Our policy is to <u>process</u> wire transfers, phone transfers, online banking transfers, in branch transactions, ATM transactions, debit card transactions, <u>ACH transactions</u>, bill pay transactions and items we are required to pay, such as returned deposited items, <u>first—as they occur on their effective date for the business day on which they are processed.</u>"

(Emphasis added).

The Agreement also states that it is "subject to applicable federal laws, the laws of the state of Michigan and other applicable rules such as the operating letters of the Federal Reserve Banks and <u>payment processing system rules</u> (except to the extent that this agreement can and does vary such rules or laws)." (Emphasis added). While not explicitly cited in the Agreement, the National Automated Clearing House Association Operating Rules and Guidelines (Guidelines) are the relevant payment-processing-system rules. *See About NACHA–The Electronic Payments Association*, NACHA The Electronic Payments Association, https://www.nacha.org/about (last visited June 14, 2018).

There are five parties to an ACH transaction: (1) the Originator (here, the individual merchant with whom Lossia did business); (2) the Originating Depository Financial Institution, or ODFI (the merchant's bank); (3) the ACH Operator (the Federal Reserve); (4) the Receiver (Lossia); (5) the Receiving Depository Financial Institution, or RDFI (Flagstar).

The term "Receiver" is something of a misnomer because the label does not necessarily refer to the party who "receives" funds in a given ACH transaction. Instead, the Receiver is the party who authorizes the Originator to introduce the transaction into the ACH Network— regardless of whether that transaction will be a *credit to* or a *debit from* the Receiver's account. *See PFG Precious Metals, Inc. v. SunTrust Bank*, No. 10 C 7709, 2012 WL 401487, at *1–2 (N.D. Ill. Feb. 7, 2012) (providing an example of an ACH transaction in which the entity who would receive the funds is the Originator). By providing his account number and routing number to an online merchant, Lossia authorized the merchant (Originator) to initiate the ACH transaction.[1] Then the merchant's bank introduced the transaction to the ACH Network by sending the transaction to the Federal Reserve (the ACH Operator), which in turn forwarded the transactions to the Receiver's bank (Flagstar) so that Lossia's account could be debited.[2]

---

[1]In payroll direct deposits between an employer and an employee, the employee is the Receiver because he or she authorized the employer (the Originator) to initiate payroll transactions in the ACH Network. The employee provided this authorization when he or she filled out payroll forms, listing his or her bank account number and routing number. In a payroll ACH transaction, the transaction is a *deposit to* the Receiver's account, while here Lossia's transactions were *debits from* his account. But in both cases, the party who provides his or her bank account number and routing number, authorizing the Originator to begin the transaction, is the Receiver.

[2]The district court incorrectly labeled Lossia as the Originator rather than the Receiver. However, the district court correctly described the sequence of events: the merchants (through their banks) initiated the

The Agreement states that ACH transactions will be processed "as they occur on their effective date for the business day on which they are processed." (Emphasis added). And the Guidelines define the effective date of an ACH transaction as "the date specified by the Originator on which it intends a batch of Entries to be settled." In practice, this date is whatever date the merchant or merchant's bank chooses to submit the transaction to the ACH Operator (the Federal Reserve). The ACH Operator then includes this settlement date in the batch records that it submits to the RDFI (Flagstar). Finally, Flagstar processes the transactions in the order that they were presented by the Federal Reserve in the batch files. In other words, Flagstar does not re-sequence the ACH transactions that it receives from the Federal Reserve.[3]

The Agreement also states that "[t]here is a combined limit of five Non-Sufficient Funds Charges per business day."

### b. Lossia's ACH Transactions

Between Wednesday, February 25 and Saturday, February 28, 2015, Lossia authorized merchants to initiate a series of ten ACH transactions to be debited from Lossia's Flagstar checking account. Each of the relevant transactions was ultimately processed by Flagstar on Monday, March 2, 2015.[4] However, much to Lossia's chagrin, the transactions were not processed in the order that he initiated them. Instead, they were processed in the order set forth below.

---

transactions by sending them to the Federal Reserve, which in turn forwarded the transactions to Flagstar for processing.

[3]Lossia states that he spoke with an assistant manager at his local Flagstar branch on March 2, 2015 who told him that Flagstar *does* re-sequence ACH transactions and "typically" posts them in a high-to-low manger, with the most expensive transactions first. This would result in the greatest number of overdraft fees against a customer. However, the record evidence demonstrates that the assistant manager was simply incorrect about the bank's current method of processing transactions. Prior to 2012, Flagstar's policy was to reorder ACH transactions from largest to smallest, but that practice has been discontinued.

[4]Lossia asserts that he checked his online banking account throughout the day on March 2 and saw that the order that the transactions were listed as pending was not the order that he initiated the transactions, and that the listed order changed several times throughout the course of the day. Flagstar concedes that the transactions may be temporarily *displayed* in a different order on the customer's online account than the order that they are ultimately processed. But because the Deposit Agreement addresses the order in which transactions will be "process[ed]," not how they are initially displayed, the online display is immaterial to Lossia's breach-of-contract claim, even if Flagstar's online listing could be made much more clear for customers.

| Order that Lossia initiated transaction | Order that Flagstar processed the transaction | Amount | Description |
|---|---|---|---|
| 1 | 3 | $200 | CHASE–EPAY |
| 2 | 4 | $450 | USAA.COM PAYMNT ACH PAYMENTS |
| 3 | 2 | $500 | AMEX E Payment ER AM – ACH PMT |
| 4 | 10 | $185.71 | BARCLAYCARD US – CREDITCARD |
| 5 | 9 | $200 | DISCOVER DC PYMNTS DCIINTNET |
| 6 | 5 | $500 | CHASE – EPAY |
| 7 | 6 | $200 | CHASE – EPAY |
| 8 | 7 | $200 | CITI CARD ONLINE – PAYMENT |
| 9 | 8 | $100 | DISCOVER DC PYMNTS DCINTNET |
| 10 | 1 | $2,285.00 | GOOGLE GOOGLE.COM/CH-WALLET/TOP |

Lossia concedes that he did not have sufficient funds in his account to pay for all ten transactions. However, Lossia argues that had the transactions been processed in the order that Lossia initiated them, his largest transaction—the $2,285 Google Wallet payment—would have been processed *last* rather than first. This would have resulted in Lossia committing just one overdraft on March 2. Instead, because the largest transaction was processed first, Lossia initially incurred eight overdraft fees on March 2. The next day, Flagstar manually reversed three overdraft fees.

## c. Procedural History

On October 25, 2016, Lossia filed his third amended complaint, alleging a federal question under the Fair Credit Reporting Act, 15 U.S.C. § 1681(p), and state-law breach-of-contract claims. Discovery had begun in November 2015 from previous iterations of the complaint. Flagstar filed a motion for summary judgment on December 13, 2016, which was granted by the district court. Lossia timely appealed, challenging the grant of summary judgment as to his breach-of-contract claims but abandoning his Fair Credit Reporting Act claim.

## II

We review de novo the trial court's grant of summary judgment. *Borman, LLC v. 18718 Borman, LLC*, 777 F.3d 816, 821 (6th Cir. 2015). Summary judgment will be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We must view the evidence in the light most favorable to the

nonmoving party. *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017). But in order to survive a summary-judgment motion, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and the "mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to demonstrate a genuine issue of material fact. *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Under Michigan law, a valid breach-of-contract claim must establish three elements: (1) the existence of a contract; (2) a breach of that contract; and (3) damages suffered by the nonbreaching party as a result of the breach. *Miller-Davis Co. v. Ahrens Const., Inc.,* 817 N.W.2d 609, 619 (Mich. Ct. App. 2012). In interpreting a contract, Michigan law requires that a contract be construed as a whole, so we must "give effect to every word, phrase, and clause . . . and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003).

Lossia raises two separate breach-of-contract claims. First, he argues that Flagstar breached the Agreement by failing to process his transactions in the order that he initiated them. Second, Lossia asserts that Flagstar's initial posting of eight overdraft charges on March 2 violated the Agreement's cap of five overdraft charges per day.

## a. Lossia's Ordering-of-Transactions Claim

The Agreement states that Flagstar's policy is to process ACH transactions "first—as they occur on their effective date for the business day on which they are processed." (Emphasis added).

Lossia contends that because "occur" is defined in common parlance to mean "to come into existence," that "[a]ny reasonable person" reading the Agreement would conclude that "occur" means the order that Lossia initiated the transaction. However, Lossia's ordering-of-transactions claim runs into two problems.

First, when read in context, the Agreement simply does not say what Lossia wants it to say. The Agreement states that transactions will be processed as they occur "on their effective

date," not necessarily the *actual* date that each transaction was initiated. And the payment processing system rules (Guidelines)—validly incorporated into the Agreement—define the phrase "effective date." *See Forge v. Smith*, 580 N.W.2d 876, 881–82 (Mich. 1998) ("Where one writing references another instrument for additional contract terms, the two writings should be read together," and noting that the original writing need not cite the title of the outside document as long as it "clearly refers for some of its terms to an extraneous document.") (internal quotation marks omitted). The Guidelines define the effective date as the "date specified by the Originator on which it intends a batch of Entries to be settled," and note that that date is passed along by the ACH Operator (the Federal Reserve) to the RDFI (here, Flagstar). Unless Lossia reaches an agreement with the merchant as to when the merchant will send the transaction to the Federal Reserve, the effective date for that transaction—and similarly, the order that a customer's various transactions will reach the RDFI (Flagstar) for processing—will be dependent on the time and date that the individual merchant chooses to send the transaction to the Federal Reserve. In short, that someone might initiate a series of ACH transactions in a particular order, say, settling a brunch debt with a friend using PayPal at noon, paying rent online at 2:00pm, then making a credit card payment at 5:00pm, does not guarantee that those transactions will reach the customer's bank in that order, or even on the same day.

Second, the unrebutted evidence demonstrates that Flagstar followed the terms of the Agreement in how it processed Lossia's ACH transactions. Flagstar produced copies of the batch files that the Federal Reserve sent to Flagstar. Lossia's relevant ACH transactions were sent by the Federal Reserve to Flagstar in two waves: several transactions were included in a 9:06 pm Sunday, March 1 transmission and the remaining transactions were sent in a 3:31 am Monday, March 2 transmission. Lossia's billing statement confirms that his transactions were processed precisely in the order that they occur in the Federal Reserve's batch files, and deposition testimony and an affidavit prepared by Flagstar confirmed that that is standard practice. And of course, Lossia makes no argument that Flagstar breached the Agreement by waiting to process the Sunday evening batch until Monday, since the Agreement notes that Flagstar will process ACH transactions on "business day[s]."

To be sure, Flagstar's ACH processing policy could have been more magnanimous to its customers. Perhaps Flagstar's policy *could* have been to process transactions in the order that purposeful customers chose to initiate them (though it is unclear whether that information ever reaches Flagstar). Or Flagstar's policy *could* have been to re-order the transactions processed on a given day in a low-to-high manner, guaranteeing that customers would be charged the fewest possible number of overdraft fees. Indeed—Flagstar *knew* how to do such ordering, because it used to do it in the most customer-unfriendly way possible. Flagstar could have been more like George Bailey and less like Mr. Potter.[5] But failing to make such a choice does not mean that Flagstar breached the Agreement. Flagstar processed Lossia's transactions as they occurred on their effective date for the business day on which they were processed.

Lossia does not offer any persuasive evidence to the contrary. Instead, Lossia argues that he was not afforded sufficient discovery to confirm whether Flagstar actually processed Lossia's transactions in the order that they were received from the Federal Reserve. However, Flagstar provided a copy of the batch files sent to Flagstar by the Federal Reserve, Lossia's end-of-month statement confirms that the transactions were processed in the same order as they were presented in those batch files**,** and Flagstar provided deposition and affidavit testimony that the bank automatically processes ACH transactions in exactly the manner that they are received in the batch files. In response, Lossia relied on testimony from two banking experts who merely opined that merchants generally submit their transactions as quickly as possible to the Federal Reserve. This may be true as a general matter, but it says nothing about the practice of these specific merchants on these particular transactions, nor does it undermine the accuracy of the batch files that Flagstar presented. In response to overwhelming evidence submitted by Flagstar, Lossia needed to do more than assert that there was "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586.

Lossia also asserts that deposition testimony from Flagstar's corporate designee that described Flagstar's ACH processing method was inadmissible hearsay. But Lossia's argument is unpersuasive for several reasons. First, as a threshold matter, the *relevant* portions of the corporate designee's deposition did not delve into any actual hearsay statements. Instead, she

---

[5]*See* IT'S A WONDERFUL LIFE (Liberty Films 1946).

relayed her knowledge of the processing system that she had obtained, in part, from speaking with other Flagstar employees. But more significantly, even if the relevant portion of her deposition testimony included hearsay statements that would themselves be inadmissible in their current form, evidence considered at the summary judgment stage need not be "in a form that would be admissible at trial," as long as the evidence could ultimately be presented in an admissible form. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see* Fed. R. Civ. P. 56(c)(2) (noting that the nonmoving party may object to the moving party's summary judgment evidence if it "cannot" be presented in a form that would ultimately be admissible). After all, the use of a corporate designee under Fed. R. Civ. P. 30(b)(6) is for the convenience of the parties for expeditious discovery and does not preclude Flagstar from calling multiple employee witnesses at trial who would have first-hand knowledge of the bank's ACH processing protocol. Absent some suggestion to the contrary, it is reasonable to expect that these employees would provide materially the same testimony that the corporate designee summarized in her deposition. Finally, the corporate designee's testimony on this point merely *confirmed* the evidence contained in the batch files that Flagstar produced, which themselves would fall under the business-records exception to the rule against hearsay. *See* Fed. R. Evid. 803(6).

There is no genuine dispute as to any material fact on Lossia's ordering-of-transactions claim.[6]

### b. Lossia's Overdraft-Fees Claim

Lossia also argues that Flagstar breached the Agreement by initially imposing eight overdraft fees on March 2. The Agreement states that "[t]here is a combined limit of five Non-Sufficient Funds Charges per business day." But Flagstar provided unrebutted evidence that Flagstar's computer system is programmed to generate a list of customers who have had more than five overdraft fees assessed in a day. Flagstar then manually reverses these additional fees for all affected customers the next business day. And that is precisely what occurred here. Thus, Lossia was not in fact required to pay more than five overdraft "charges," so there was no

---

[6]In so holding, we decline to decide whether Lossia's ordering-of-transactions claim is separately barred by the settlement reached in a class-action suit, of which Lossia was not a class member. *See Faris v Flagstar Bank, FSB*, Oakland County, Michigan, Circuit Court Case No. 15-145287-CZ (Nov. 16, 2016).

breach.   And even if we were to construe this initial posting of eight fees as a breach of the Agreement, the next-business-day reversal eliminated Lossia's damages, preventing Lossia from establishing another element necessary for a breach-of-contract claim.  *See Miller-Davis Co.*, 817 N.W.2d at 619.

Lossia attempts to sidestep this fact by arguing that not all prospective class members may have had their charges reversed.  After all, Lossia reasons, because Flagstar's policy is to *manually* reverse the excess charges, it is possible that some prospective class members may have slipped through the cracks and not had their charges reversed.  Thus, Lossia seeks class-wide discovery to see whether other persons may not have had their charges reversed.  But "[a]s [the Supreme Court] has repeatedly held, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (internal quotation marks omitted). Because neither Lossia nor his fellow plaintiff suffered any damages on this claim, they cannot be valid class representatives to pursue it.

There is no genuine dispute as to any material fact on Lossia's overdraft-fees claim.

**III**

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to Flagstar.