NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0265n.06

Case No. 22-1229

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DANIEL WILLIAM RUDD, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| CITY OF NORTON SHORES; GARY NELUND, | ) | MICHIGAN |
| Mayor; individually and in his official capacity; | ) | |
| DANIEL SHAW, Police Chief; individually and in | ) | |
| his official capacity; MATTHEW RHYNDRESS, | ) | OPINION |
| Sergeant; individually and in his official capacity; | ) | |
| MICHAEL WASILEWSKI; MARK MEYERS, | ) | |
| individually and as city manager; CHRIS | ) | |
| MCINTIRE, F/Lt.; Michigan State Police; only in | ) | |
| his individual capacity; DOUGLAS MARK | ) | |
| HUGHES, Attorney, individually and acting on | ) | |
| behalf of his law firm; WILLIAM HUGHES, | ) | |
| PLLC, a Michigan law firm; MELISSA MEYERS, | ) | |
| Attorney, individually and acting on behalf of her | ) | |
| law firm; MICHELLE M. MCLEAN, Attorney, | ) | |
| individually and acting on behalf of her law firm; | ) | |
| JOEL W. BAAR, Attorney, individually and acting | ) | |
| on behalf of his law firm; BOLHOUSE, BAAR & | ) | |
| HOFSTEE, PC, a Michigan law firm, nka | ) | |
| Bolhouse, Hofstee & McLean, PC; JON GALE, | ) | |
| Norton Shores Police Chief, | ) | |
| Defendants-Appellees. | ) | |

Before: SUHRHEINRICH, MOORE, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Just because a plaintiff has *pleaded* a claim does not mean that the plaintiff can *prove* the claim. This case exemplifies that principle. Three years ago, we held that Daniel Rudd's complaint plausibly alleged that many public and private actors conspired to retaliate against him because of his criticism of local officials. *Rudd v. City of Norton Shores*, 977 F.3d 503, 507 (6th Cir. 2020). After discovery, however, the district court held that Rudd lacked enough evidence to obtain a trial. It granted summary judgment to all defendants. We agree and affirm.

I

A

As in Rudd's prior appeal, we will summarize his factual claims using the "four key" assertions from his complaint. *Id.* At this summary-judgment stage, however, Rudd must back up the complaint's assertions with enough evidence to create "a genuine issue of material fact." *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018).

1. *The Abduction*. Rudd lives near the City of Norton Shores on the northwest side of Michigan's lower peninsula. In July 2013, he and his ex-wife vigorously contested who should have custody of their two sons. A state court had given them joint custody. But Rudd feared for his children's safety when they were with his ex-wife's new husband. Her new husband had recently been paroled for a violent assault. He had also recently threatened Rudd and possessed firearms while drunk. Rudd thus had obtained a personal protection order against this man and did not want him near Rudd's children.

Starting on Friday, July 19, Rudd experienced "the most terrifying three days of" his life. Rudd Dep., R.258-5, PageID 2875. The state court's custody order required his ex-wife to drop

2

their kids off with him that day. She refused to do so or to tell Rudd where she was. Although she was estranged from her new husband at this time, Rudd worried that she might have taken their kids to her husband's home or that this man might be angrily looking for her (and their children).

According to Rudd, their attorneys brokered a compromise in which his ex-wife would deliver the kids to him on Saturday. But she again failed to show up. Her erratic behavior made Rudd increasingly alarmed for his children's safety. On Saturday night, Rudd called a state trooper with whom he had previously spoken about his ex-wife's husband. The trooper told him to contact the local police.

Rudd and his ex-wife continued to exchange text messages on Sunday, July 21. His ex-wife's texts began to suggest that she would deliver the kids to Rudd if he made several concessions in their custody case. The lawyerly nature of these messages led Rudd to suspect that his ex-wife was passing along demands from her lawyer, Melissa Meyers. Rudd had also seen recent pictures on Facebook of his kids playing at Meyers's Norton Shores home. He thus believed that they might be staying there.

Rudd called 911. The dispatcher deployed Norton Shores Police Officer Michael Wasilewski to speak with him. Rudd asked Wasilewski to go to Meyers's home to look for his kids. Wasilewski refused because Rudd lacked proof that the children were there. According to Rudd, Wasilewski suggested that Rudd go to Meyers's house himself. Rudd did not feel comfortable doing so. But Wasilewski reiterated that he would speak with Meyers only if Rudd found proof that his children were at her house.

Rudd thus drove to Meyers's neighborhood and parked near her home. Meyers was not home. But her husband, Norton Shores City Manager Mark Meyers, was. Mark Meyers saw an unknown man (Rudd) staring at him from what he thought was an unusual car on the street.

Concerned about a potential "threatening situation," he called Norton Shores Police Chief Daniel Shaw. Meyers Dep., R.262-4, PageID 3170. Shaw sent Sergeant Matthew Rhyndress to the scene.

Rudd explained the circumstances to Rhyndress. But the officer responded that the police would not investigate Melissa Meyers and threatened to arrest Rudd if he did not leave. Rudd drove away without incident. Rudd's ex-wife disclosed her location later that day. Rudd contacted the sheriff's department, and deputies picked up his kids from his ex-wife while he was parked nearby.

2. *2013 Personal Protection Order*. The next day, Melissa Meyers petitioned a state court for a personal protection order against Rudd. (To distinguish Melissa Meyers from her husband, we will generally refer to her as Meyers and her husband by his full name.) Her request described Rudd's conduct and noted that Chief Shaw and Sergeant Rhyndress had advised her to seek the order. A judge granted an ex parte protection order that would expire on February 1, 2014. The order barred Rudd from, among other things, "appearing within sight of" Meyers or "sending mail or other communications" to her. Order, R.210-1, PageID 2032. The Norton Shores Police Department entered this order into the state's "Law Enforcement Information Network" (or "LEIN") database.

After learning of the protection order, Rudd moved to terminate it. Meyers's protection-order case had been assigned to the same court overseeing Rudd's custody case. In December 2013, that court denied Rudd's motion to terminate and decided that the protection order "shall remain in full force and effect until further order of the Court." Order, R.262-15, PageID 3260.

The parties have debated the effect of the court's decision. Rudd has pointed to the court's statements at the hearing on his motion. The court noted that the order would end when Rudd and his ex-wife could "resolve [their] child parenting issues." Tr., R.73-3, PageID 555. It anticipated

that this resolution would occur within weeks and that its decision favored Rudd because the protection order was "not going to continue" through its original expiration date. *Id.*, PageID 556, 565. As Rudd conceded, though, the court never formally terminated the order. Rudd Dep., R.258-5, PageID 2933. Rudd thus believed that it expired on its own terms in February 2014. Meyers, by contrast, asserted that the court's decision had the opposite effect—of keeping the protection order in place indefinitely. Either way, the LEIN database continued to show the order as expiring in February 2014.

As part of the custody case, the state court soon requested a psychological evaluation of Rudd, his ex-wife, and her new husband. A psychologist recommended that Rudd receive "full physical and legal custody" of the children. Flood Rep., R.292-2, PageID 4155. The court gave Rudd sole custody in 2014.

3. *2015 Citizen Complaint*. Rudd did not believe that the Norton Shores police had properly handled his request for help in July 2013 when his ex-wife had taken their children. But he chose not to file a complaint against the police at that time because he did not believe that Chief Shaw had been honest and he feared that further complaints might harm his custody case. Rudd's views about whether to file a complaint changed when Chief Shaw retired. On July 20, 2015, Rudd sent a citizen complaint to the city's new Chief, Jon Gale. Rudd asserted that Shaw, Sergeant Rhyndress, and Officer Wasilewski had ignored his allegations against Melissa Meyers because of her marriage to the Norton Shores City Manager. Compl., R.1-1, PageID 32–33. He also asserted that the department refused to help him find his children in retaliation for his allegations. After the incident, moreover, he asserted that Chief Shaw had illegally disclosed to Mark Meyers information about him from the LEIN database.

5

On receiving Rudd's complaint, Chief Gale passed it along to Mark Meyers pursuant to normal department procedure. Because Chief Gale had not worked for Norton Shores in 2013, he asked Mark Meyers and Shaw for background information. They provided it. But Mark Meyers told Gale that it would be improper for him (a party named in Rudd's complaint) to take part in the investigation and directed Gale to report to Mayor Gary Nelund.

Chief Gale met with Rudd a few days later. Gale told Rudd that he would refer the investigation of Rudd's complaint to the Michigan State Police because of the conflicts of interest.

Gale asked Lieutenant Christopher McIntire of the state police (and a high-school friend) to investigate Rudd's complaint. McIntire recalls Gale asking him to investigate a "potential abuse of authority" by Mark Meyers and a violation of "LEIN policy" by the Norton Shores police. McIntire Dep., R.258-2, PageID 2685.

At the start of the investigation in late July, McIntire spoke to Rudd. McIntire stated that he would treat Rudd's complaint like any other criminal investigation. He suggested that he would, among other things, talk with LEIN field services, examine the LEIN computer records, and interview the officers.

According to Rudd, however, McIntire undertook a slipshod investigation. McIntire first spoke with a local prosecutor. The prosecutor told him that Mark Meyers would not have abused his authority by calling Chief Shaw to report the car parked by his house. McIntire believed that this conversation "put to rest" any abuse-of-authority claim. *Id.*, PageID 2691. McIntire next asked Mark Meyers whether he had received any LEIN information from the police. McIntire took him at his word that he had not. In late August, McIntire called Rudd again to tell Rudd that he had uncovered no illegal conduct. McIntire also told Rudd about the limited nature of his

investigation, conceding that he had reviewed no records and had merely spoken to Mark Meyers and a prosecutor. McIntire wrote no formal report.

4. *Alleged Retaliation*. Rudd alleges that Melissa Meyers orchestrated a campaign to retaliate against him because of his citizen complaint. Five days after he filed the complaint, he was coaching his children at a weekend soccer tournament. Meyers was there with her family. When she saw Rudd, she asked Rudd's ex-wife to inform him that his presence violated the still-operable protection order and that he should leave. Rudd's ex-wife texted him that Meyers was there and that he "may want to keep [his] distance." Text, R.73-3, PageID 562. But Rudd says that he never even saw Meyers because he was busy coaching the team.

On July 28 (about a week after Rudd's citizen complaint), Melissa Meyers emailed Rudd's attorney to accuse him of violating the protection order at the soccer tournament. Meyers stated that she did not want to put Rudd's children "through the trauma of police interaction" but threatened to enforce the order at future soccer events. Email, R.267-5, PageID 3515. Meyers connected her concerns with Rudd to the "false" and "defamatory comments" that he made in his citizen complaint. *Id.*, PageID 3516. She added that the LEIN database no longer included the protection order and that she intended to have it placed back there. A few days later, Meyers, represented by Michelle McLean, her colleague at the law firm of Bolhouse, Baar, & Hofstee, sought a "nunc pro tunc order" to clarify that the protection order remained in effect and should be relisted in the LEIN database. Mot., R.212-6, PageID 2281–82.

After a few weeks, Rudd became concerned with the pace of McIntire's investigation. On August 25, he sent a public-records request to Norton Shores asking for all records relating to his citizen complaint. Three days later, Melissa Meyers asked the Norton Shores Police Department to reenter the protection order into the LEIN database on its own initiative without waiting for the

court. The officer on duty (who is not a party in this case) called court officials to confirm that the protection order remained operable and reentered it into the database. This action led Meyers to withdraw her pending motion to have the state court clarify the order's status.

Rudd, who believed that the order had expired in February 2014, learned that it remained active through a letter that he received from the state police in September 2015. He called the Norton Shores police to complain that Meyers had "circumvented 'the system'" by scheming with them to reimpose the order without the court's permission. Field Contact, R.262-17, PageID 3268. Yet the same on-duty officer told him that the protection order remained in effect. In October, Rudd (who could no longer afford an attorney) filed a pro se motion asking the court to declare that the protection order had expired.

On November 2, Melissa Meyers responded to Rudd's motion by asking the court to hold him in civil and criminal contempt for violating the protection order. Her motion alleged that the "knowingly false" statements in Rudd's citizen complaint had started a fresh campaign of harassment that included his meeting with Chief Gale, his attendance at his children's soccer games, and other "defamatory" comments. Mot., R.210-9, PageID 2088–91.

Three days later, Norton Shores City Attorney Douglas Hughes mailed Rudd a cease-and-desist letter. Hughes stated that Mayor Nelund had asked him to "monitor" Rudd's conduct toward Mark Meyers. Letter, R.262-19, PageID 3276. Hughes claimed that Rudd had made "serious defamatory and disparaging remarks about" Mark Meyers and the Norton Shores police. *Id.* He also threatened to "take whatever action is legally necessary to protect the professional and privacy rights" of the City Manager. *Id.* Hughes lastly told Rudd to be "mindful" of his speech. *Id.*

The state court held a hearing on November 9 to address Rudd's and Melissa Meyers's pending motions. Joel Baar, the managing partner of Bolhouse, attended the hearing. Before it

began, Baar and McLean discussed a settlement with Rudd. They suggested that Meyers would no longer seek to enforce the protection order if Rudd agreed to stay away from her and her husband and if he stopped asking Norton Shores to investigate the events of 2013. Rudd readily agreed to stay away from Mark and Melissa Meyers. But he did not find it "appropriate" to connect the protection order to his complaint about the Norton Shores government. Tr., R.212, PageID 2368. During these negotiations, McLean made comments suggesting that Rudd faced criminal liability and that the hearing "could turn into like an arraignment today." *Id.*, PageID 2364. Rudd thus concluded that Baar and McLean were coercing him to drop his citizen complaint on the threat of criminal punishment.

At the hearing, an exasperated court lambasted Melissa Meyers and McLean for overreacting to Rudd's request that the court find the protection order inoperative. Among other things, the court reminded them that "personal protection orders do not protect against slander or defamation." Tr., R.262-24, PageID 3294–95. It nevertheless ordered the parties to mediate and kept the protection order in place in the meantime.

Eventually, Rudd agreed to have no further contact with Melissa Meyers. Meyers, in turn, agreed to withdraw from representing Rudd's ex-wife. In February 2016, the court ordered the protection order removed from the LEIN database.

B

Two years later, Rudd filed this lawsuit. He sued Mark and Melissa Meyers, Chiefs Shaw and Gale, Officer Wasilewski, Sergeant Rhyndress, City Attorney Hughes and his law firm, Mayor Nelund, the City of Norton Shores, Lieutenant McIntire, Baar, McLean, and the Bolhouse firm. The district court dismissed his complaint. *See Rudd*, 977 F.3d at 511.

9

We reversed, concluding that Rudd had adequately pleaded a retaliation claim under the First Amendment. *Id.* at 513–20. We first held that Rudd plausibly alleged that various defendants took adverse actions against him (ranging from refusing to help him find his children to trying to have him thrown in jail) in retaliation for his speech. *Id.* at 513–17. We next held that Rudd plausibly alleged that the defendants engaged in a conspiracy to retaliate against him for his speech, thereby allowing all of them to be held jointly liable for the adverse actions. *Id.* at 517–20.

On remand, the parties conducted voluminous discovery. In two orders, the district court ruled for the defendants. In the first order, the court granted summary judgment to Lieutenant McIntire. *See Rudd v. City of Norton Shores*, 2022 WL 797473, at *1 (W.D. Mich. Mar. 16, 2022). It held that none of McIntire's actions (such as his allegedly deficient investigation) rose to the level of an "adverse action" cognizable under the First Amendment. *See id.* at *4–7. It next held that Rudd could not hold McIntire liable for the conduct of other defendants because Rudd lacked sufficient evidence that McIntire participated in a conspiracy to retaliate against him. *Id.* at *7–8.

In the second order, the district court granted summary judgment to the remaining defendants. *See Rudd v. City of Norton Shores*, 2022 WL 801435, at *1 (W.D. Mich. Mar. 16, 2022). The court initially ruled for Chief Shaw, Sergeant Rhyndress, and Officer Wasilewski on statute-of-limitations grounds. It found that Rudd had not timely filed his claims against these officers for their conduct back in 2013. *See id.* at *10–11.

The district court next ruled for Mark Meyers and Chief Gale. As with McIntire, it decided that Rudd lacked evidence from which a reasonable jury could find that these two defendants took any "adverse action" against him under the First Amendment. *See id.* at *11–14.

That left two city officials—Mayor Nelund and City Attorney Hughes (and his law firm). Rudd claimed that these officials had retaliated against him by sending the cease-and-desist letter.

The district court concluded that Rudd lacked sufficient evidence that Nelund participated in sending this letter. *Id.* at \*15. Yet the court believed that a jury could find that Hughes's threats in the letter qualified as an adverse action in retaliation for Rudd's speech. *Id.* at \*16–18. But the court also found that the existing caselaw did not clearly establish the illegality of the cease-and-desist letter. *Id.* at \*17–18. The court thus held that Hughes was entitled to qualified immunity (and that Nelund would be entitled to that immunity even if he had participated in sending the letter). *Id.*

The district court turned to the claim against the City of Norton Shores. Rudd sought to hold the city liable for Hughes's letter under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The court decided that Rudd had failed to connect this letter to any official with policymaking authority (such as Mayor Nelund) whose conduct could qualify as the city's official policy. *Id.* at \*18–19.

The court lastly rejected Rudd's claims against the private defendants: Melissa Meyers, Baar, McLean, and the Bolhouse firm. It concluded that he lacked sufficient evidence that they conspired with any government actor so as to make their conduct state action. *Id.* at \*19–20.

The court declined to exercise supplemental jurisdiction over Rudd's remaining state-law claims. It dismissed them without prejudice. *Id.* at \*20–21.

II

A

Rudd appeals a second time. As in his first appeal, we "begin with the ground rules." *Rudd*, 977 F.3d at 511. Rudd now confronts a more demanding procedural framework. At this summary-judgment stage, we continue to conduct de novo review of the district court's decision against him. *See Lemaster v. Lawrence County*, 65 F.4th 302, 306 (6th Cir. 2023). Unlike at the

pleading stage, however, Rudd no longer may rely on mere allegations that "plausibly suggest" that he could meet all of the elements of his First Amendment claim. *Rudd*, 977 F.3d at 511–12. He must produce evidence that would allow a rational jury to rule in his favor on all of the elements that he would bear the burden to prove at trial. *See Lemaster*, 65 F.4th at 309–10. If Rudd produces this evidence, we review it in the light most favorable to him and draw all reasonable inferences in his favor. *See Lossia*, 895 F.3d at 428.

That said, the substantive constitutional and statutory rules for Rudd's First Amendment claim under 42 U.S.C. § 1983 remain the same. *See Rudd*, 977 F.3d at 511. Start with the constitutional components of this claim. A First Amendment retaliation claim has three elements. *See id.* at 513. Rudd must show that he engaged in conduct that the First Amendment protects. *See id.* He must show that the defendants took a harmful "adverse action" against him. *See id.* at 514–15. And he must show that the protected conduct caused the adverse action. *See id.* at 515.

Turn to the statutory components of the claim. Section 1983 does not permit Rudd to hold one defendant liable for another defendant's conduct on vicarious-liability grounds. *See id.* at 512. Rudd must connect each defendant's own conduct to a purported First Amendment violation. *See id.* Likewise, § 1983 does not permit Rudd to sue private defendants for private action. *See id.* He must show that these private actors acted "under color of" state law. *See id.* Rudd may satisfy both elements by proving that the private and public defendants conspired to violate his First Amendment rights. *See id.* at 512–13, 517. This conspiracy can turn the private defendants' actions into state action for purposes of § 1983 (and the First Amendment). *See id.* at 512. And it can permit Rudd to hold one defendant liable for another's actions. *See id.* at 513.

B

The last time around, we held that Rudd's complaint plausibly pleaded all of the substantive requirements for his First Amendment claim as against all of the defendants. Yet Rudd's briefing in this second appeal abandons the first half of his case: He no longer attempts to rely on any allegedly protected activity from July 2013 when his ex-wife kept his children from him. In fact, Rudd does not dispute the district court's conclusion that he did not timely sue Chief Shaw, Sergeant Rhyndress, and Officer Wasilewski for their conduct at that time. *See Rudd*, 2022 WL 801435, at *10–11. He has thus forfeited any challenge to this statute-of-limitations holding. *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022). And because the holding independently forecloses his claims against these officers, we can affirm the decision to grant them summary judgment on this forfeiture ground alone. *See White Oak Prop. Dev., LLC v. Washington Township*, 606 F.3d 842, 854 (6th Cir. 2010).

Rudd instead argues only that the First Amendment protected two activities from 2015: his citizen complaint on July 20 and his public-records request on August 25. *See Rudd*, 977 F.3d at 514. Yet Rudd's briefing also abandons reliance on some of the alleged "adverse actions" that the defendants took in response to this speech. Most notably, his opening brief nowhere disputes the district court's decision to grant qualified immunity to Mayor Nelund and City Attorney Hughes for the cease-and-desist letter that Hughes sent to Rudd. *See Rudd*, 2022 WL 801435, at *16–18. Indeed, his opening brief mentions the phrase "qualified immunity" only once and only when summarizing the district court's decision. Appellant's Br. 33. In addition, although he spends a paragraph on qualified immunity in his reply brief, that (similarly cursory) analysis came "too late." *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1017 (6th Cir. 2022); *see Bose v. Bea*, 947 F.3d 983, 993 (6th Cir. 2020). We thus need not consider whether Hughes's threat to take

13

legal action could qualify as an adverse action. Rudd has forfeited any contrary claim. *See Buetenmiller*, 53 F.4th at 946.

Rudd instead relies on four other alleged "adverse actions" that he says the defendants took as a result of his speech. *First*, Rudd argues that Chief Gale disclosed his citizen complaint to Mark Meyers and Chief Shaw in retaliation for his decision to file the complaint. *See* Appellant's Br. 38–41. This claim fails because no reasonable jury could find Gale's conduct sufficiently "adverse" to be actionable under the First Amendment. The First Amendment protects against retaliatory actions only if they could deter a "person of ordinary firmness" from engaging in expression. *See Rudd*, 977 F.3d at 514 (quoting *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010)). The amendment thus does not protect against "inconsequential" actions that cause merely "de minimis injury" because those types of actions would not dissuade anyone from speaking. *Wurzelbacher v. Jones-Kelly*, 675 F.3d 580, 584 (6th Cir. 2012) (quoting *Bell v. Johnson*, 308 F.3d 594, 603, 606 (6th Cir. 2002)).

Chief Gale's disclosure of Rudd's citizen complaint to Mark Meyers and Chief Shaw falls on the "inconsequential" side of this divide. *Id.* (citation omitted). At the pleading stage, Rudd alleged that the disclosure breached the city's confidentiality rules. *See Rudd*, 977 F.3d at 515. The evidence proves the contrary. To be sure, Gale acknowledged that he shared the complaint with Mark Meyers and Shaw. Gale Dep., R.286-23 PageID 3872–73; Gale Interrog., R.286-2, PageID 3685. But the Norton Shores Police Department's standard operating procedures *required* Gale to alert these individuals; the procedures did not *prohibit* that notification. When somebody raises a complaint against an employee, those procedures say, an investigator must "contact the employee as soon as possible (unless contact would jeopardize a criminal investigation) and notify them of the complaint." Procedures, R.286-3, PageID 3694. The procedures also state that the

employee "will be" "provided with a copy of the original complaint." *Id.* Chief Gale added that he discussed the complaint with Mark Meyers and Shaw because he had not worked for the city in 2013 and wanted to obtain background information. Gale Interrog., R.286-2, PageID 3685.

Gale's decision to follow department policy and seek basic information about the complaint would not dissuade a reasonable person from speaking. *See Wurzelbacher*, 675 F.3d at 584. If anything, an ordinary person would "expect" as a common-sense matter that a complaint's targets would learn of it. *Rudd*, 2022 WL 801435, at \*13. How else would Norton Shores investigate but by questioning the people involved? Perhaps if confidentiality was critical or if a disclosure of a complaint to the targets could harm the complainant, the disclosure might suffice to be an adverse action under the First Amendment. *Cf. Bloch v. Ribar*, 156 F.3d 673, 678–81 (6th Cir. 1998). But Rudd's case does not fit this description.

In response, Rudd argues that Norton Shores has long treated citizen complaints as confidential. Appellant's Br. 39–40. But he cites Chief Gale's affidavit from another case discussing public-records requests. Gale Aff., R.1-1, PageID 36–38. The fact that the city might follow different policies for disclosures to the *public* in no way undermines Chief Gale's assertion that the city's normal protocol required disclosure to the *targets* of a complaint.

Rudd also claims that Gale could not recall disclosing a complaint to its target before. Appellant's Br. 39–40. This claim misrepresents Gale's testimony. Gale merely stated that there was nothing "normal" about Rudd's complaint because Gale did not often receive complaints about high-ranking officials like the city manager or police chief. Gale Dep., R.286-23, PageID 3873. In sum, Chief Gale's initial investigatory steps upon receiving Rudd's complaint were not sufficiently "adverse" as a matter of law. *See Wurzelbacher*, 675 F.3d at 584–85.

*Second*, Rudd argues that Chief Gale and Lieutenant McIntire undertook a "sham" investigation of his complaint in retaliation for his filing it. *See* Appellant's Br. 41–43, 47–48. But their investigation also would not have dissuaded an ordinary person from speaking and so cannot establish an "adverse action" as a matter of law. Indeed, Rudd cites no case supporting his claim that a government's mere failure to investigate a citizen's complaint qualifies as actionable "retaliation" for the complaint. That view would impose a First Amendment duty on the government to investigate complaints. But that duty would conflict with the black-letter rule that a citizen's "right to petition" the government does not require the government to respond in any particular way. *Gerber v. Herskovitz*, 14 F.4th 500, 512 (6th Cir. 2021) (citing *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984)); *see EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 863–64 (6th Cir. 2012). Even if Chief Gale and Lieutenant McIntire had refused to "listen" to Rudd or "respond" to his complaint at all, then, the complete absence of an investigation would not have offended the First Amendment. *Minn. State Bd. for Cmty. Colls.*, 465 U.S. at 285; *cf. Khaled v. Dearborn Heights Police Dep't*, 711 F. App'x 766, 771 (6th Cir. 2017). So Rudd's claim that they conducted too cursory of an investigation necessarily falls short too.

*Third*, Rudd argues that the Norton Shores police reentered Melissa Meyer's protection order against him into the LEIN database in retaliation for his public-records request. *See* Appellant's Br. 43–46. This claim fails on a different ground: causation. The Supreme Court's First Amendment caselaw follows a burden-shifting approach to establishing the required causal connection between a plaintiff's protected activity and a defendant's harmful action. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87 (1977); *Lemaster*, 65 F.4th at 309–10. A plaintiff must initially show that protected activity was a "substantial or motivating factor" for the defendant's harmful action. *Lemaster*, 65 F.4th at 309 (citation omitted). If the

plaintiff meets this initial burden, a defendant may then avoid liability by showing that it would have taken the same harmful act even if the plaintiff had not engaged in the protected speech. *See id.* That is, the defendant "must prove the *absence* of but-for causation." *Id.*

Here, Rudd lacks evidence from which a "rational" jury could find that his public-records request in any way motivated the decision to reenter the protection order into the LEIN database. *See id.* (citation omitted). Uncontradicted evidence shows that the Norton Shores employee who made this decision—Debra Strandberg—is not someone involved in this litigation. Field Contact, R.262-17 PageID 3267–68; Strandberg Aff., R.262-18, PageID 3272. According to Strandberg's records, Melissa Meyers came to the police department and asked her to put the protection order back into the database. Field Contact, R.262-17 PageID 3267–68. Strandberg called the state court to confirm Meyers's account, and an employee at the court directed her to take this action. *Id.*, PageID 3268. Rudd himself has described Strandberg's summary as "a believable report." Rudd Dep., R.258-5, PageID 2984. No evidence suggests that Strandberg reentered the protection order at the request of any Norton Shores defendant. Nor does any evidence suggest that Strandberg even knew of Rudd's public-records request, let alone took this action because of it. Without such evidence, Rudd cannot create a jury issue on this causation element. *See Spithaler v. Smith*, 803 F. App'x 826, 829–30 (6th Cir. 2020).

Rudd responds that Strandberg's records suggest that she checked with her supervisor before reentering the order into the database and that this supervisor could have been one of the Norton Shores defendants. He misreads her records. They indicate that the court employee who spoke with Strandberg checked with her *court* supervisor—not that Strandberg checked with her *police* supervisor. Field Contact, R.262-17, PageID 3268. So Rudd identifies nothing to suggest that any Norton Shores defendant participated in this decision.

17

Rudd also argues that a jury could find the required causal connection based exclusively on the close proximity between his public-records request (August 25) and the decision to reenter the order into the database (August 28). But we have made clear that a plaintiff can avoid summary judgment based on temporal proximity alone only in rare cases. *Lemaster*, 65 F.4th at 310; *see Sensabaugh v. Halliburton*, 937 F.3d 621, 630 (6th Cir. 2019); *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525–26 (6th Cir. 2008). This case is not one of the rare ones. The evidence showing that Strandberg made this decision independent of any of the Norton Shores defendants leaves no doubt that they did not participate in it.

*Fourth*, and finally, Rudd points out that his citizen complaint led the private defendants (Melissa Meyers, Baar, McLean, and the Bolhouse firm) to take "adverse actions" against him, including their attempt to hold him in criminal contempt for filing it. And he argues that a rational jury could treat their harmful conduct as state action because the jury could find that they conspired with the Norton Shores defendants to retaliate against him for his speech. Appellant's Br. 48–50. As we previously explained, this type of conspiracy claim requires Rudd to prove that "a single plan" existed, that each conspirator "shared in the general conspiratorial objective," and that one of the conspirators committed an "overt act" to implement the conspiracy. *Rudd*, 977 F.3d at 517 (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)); *see also Rieves v. Town of Smyrna*, 67 F.4th 856, 862 (6th Cir. 2023).

The allegations in Rudd's complaint (even if "improbable") sufficed to allege a conspiracy at the "early" pleading "stage" of his case. *Novak v. City of Parma*, 932 F.3d 421, 436 (6th Cir. 2019). At the summary-judgment stage, however, Rudd needed to identify "specific evidence" (direct or circumstantial) that would permit a rational jury to find this conspiracy. *Boykin v. Fam.*

*Dollar Stores of Mich., LLC*, 3 F.4th 832, 842 (6th Cir. 2021). But Rudd failed to present sufficient evidence to show that any Norton Shores defendant entered into a general scheme with these private actors to punish him for his speech. *Cf. Hooks*, 771 F.2d at 944. Mark Meyers, for example, quickly recused himself from any involvement in the city's investigation into Rudd's complaint. Meyers Dep., R.262-4, PageID 3177. He even told his wife that she would have to file a public-records request for Rudd's citizen complaint because he could not share it with her. Meyers Aff., R.264-4, PageID 3350–51. And while Rudd alleges that Mark Meyers secretly engineered the city's purported actions against him, only his "conclusory" speculation supports this claim. *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009); *see Rudd*, 2022 WL 801435, at *11–12.

Likewise, Rudd identifies no evidence to suggest that Mayor Nelund or Chief Gale spoke with any private defendant about Rudd's complaint, let alone organized a scheme to retaliate against him through those private defendants. Nelund acknowledged that Gale informed him about Rudd's complaint and that Gale planned to turn the complaint over to the state police. Nelund Dep., R.262-25, PageID 3306. But Nelund did not spend any time looking into the issue. *Id.*, PageID 3307. Gale likewise recounted all of his conversations about Rudd's complaint, none of which included Melissa Meyers, McLean, or Baar. Gale Interrog., R.286-2, PageID 3685. Gale also attended the state court's hearing on Melissa Meyers's contempt motion against Rudd only because Meyers had subpoenaed him, thereby compelling his attendance. Gale Dep., R.286-23 PageID 3889. For her part, Melissa Meyers likewise testified that she had no conversations with Nelund or Gale about Rudd's complaint. Meyers Aff., R.264-4, Page ID 3350.

In response, Rudd points to statements by McLean and Baar during their settlement negotiations with him before the hearing on Melissa Meyers's contempt motion. Rudd is correct

that these defendants connected Meyers's protection order to Rudd's citizen complaint.  But they did so as agents for Melissa Meyers, not the Norton Shores defendants.  Whether rightly or wrongly, Meyers believed that Rudd's complaint against her husband was an attempt to harass her indirectly and that Rudd's allegedly "false" statements violated the terms of the protective order.  Meyers Aff., R.264-4, PageID 3351.  The state court later clarified that, while Melissa Meyers may have a valid defamation claim against Rudd, her protection order did not protect against this type of speech.  Tr., R.262-24, PageID 3294–95.  Yet her personal concerns with Rudd's speech toward her family do not suffice to allow a jury to find a conspiracy with any of the Norton Shores defendants.

\* \* \*

This conclusion leaves two other issues.  Rudd challenges the district court's holding that he cannot hold Norton Shores liable for Hughes's cease-and-desist letter.  Appellant's Br. 50–51.  A plaintiff can hold a city liable under § 1983 only for its own policies or customs—not for those of its employees.  *See Lemaster*, 65 F.4th at 312.  Yet an official's decision can qualify as the city's own policy if the city has delegated final decisionmaking authority to the official and if the official has policymaking power.  *See id.* at 312–13.  Rudd claims that Mayor Nelund, Mark Meyers, and Chief Gale all qualify as such officials and that they may have authorized Hughes's letter.  The problem?  As the district court explained, no evidence suggests that any of these defendants approved of the threats in Hughes's letter.  *See Rudd*, 2022 WL 801435, at \*15, \*19.  As his primary support for his contrary claim, Rudd cites one of Hughes's billing entries.  According to Rudd, the entry might suggest that Mark Meyers approved the letter because it implies that Hughes spoke with him around the same time that Hughes drafted it.  But this speculation would not permit

a jury to find this fact in conflict with Mark Meyers's testimony that he did not ask Hughes to write the letter. Meyers Dep., R.262-4, PageID 3183.

Rudd separately asks us to reverse the district court's decision to decline supplemental jurisdiction over his state-law claims in the event that we reverse its judgment on his First Amendment claims. *See Gambrel v. Knox County*, 25 F.4th 391, 412 (6th Cir. 2022); Appellant's Br. 51–52. But we have affirmed that judgment. And Rudd offers no other basis to overturn the discretionary dismissal of these state-law claims without prejudice.

We affirm.